# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

CARISSA M. SMOLYN,

                      **Plaintiff,**          **1:14-cv-56**
                                               **(GLS/CFH)**

        **v.**

TYCO INTEGRATED SECURITY
LLC et al.,

                      **Defendants.**

_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Caplan & Caplan P.C. | MURRAY N. CAPLAN, ESQ. |
| 1719 Central Avenue | |
| Albany, NY 12205 | |
| **FOR THE DEFENDANTS:** | |
| Ogletree, Deakins Law Firm | JENNIFER A. RYGIEL-BOYD, |
| 10 Madison Avenue | ESQ. |
| Suite 400 | |
| Morristown, NJ 07960 | |

**Gary L. Sharpe**
**Senior District Judge**

## <u>MEMORANDUM-DECISION AND ORDER</u>

### I. <u>Introduction</u>

Plaintiff Carissa M. Smolyn commenced this action against

defendants Tyco Integrated Security LLC (TIS), ADT Security Services,

Inc., Tyco International Management Company, LLC (TIMCO), and Tyco International (US) Inc.[1] pursuant to Title VII of the Civil Rights Act of 1964,[2] the Pregnancy Discrimination Act of 1978 (PDA),[3] and the Civil Rights Act of 1991,[4] seeking damages for employment discrimination on the basis of gender and pregnancy. (Compl., Dkt. No. 1.) Pending before the court is a motion for summary judgment filed by defendants, (Dkt. No. 40), as well as a cross motion for summary judgment filed by Smolyn, (Dkt. No. 41). For the reasons that follow, defendants' motion is granted in part and denied in part, and Smolyn's motion is denied.

## II. **Background**[5]

In March 2008, Smolyn was hired by ADT Security Services, a predecessor company of TIS, as a commercial sales manager. (Defs.' Statement of Material Facts (SMF) ¶¶ 1-2, Dkt. No. 40, Attach. 1.) In that role, Smolyn oversaw sales representatives selling commercial security

_____

[1] In May 2014, by stipulation of the parties, Tyco International (US) Inc. was dismissed as a party to this action. (Dkt. No. 19.)

[2] *See* 42 U.S.C. §§ 2000e-2000e-17.

[3] *See* 42 U.S.C. § 2000e(k).

[4] *See* Pub. L. No. 102-166, 105 Stat. 1071 (1991).

[5] Unless otherwise noted, the facts are not in dispute.

systems and services in the Albany District, which was part of the New England Sales Area.  (*Id.* ¶ 2; Pl.'s Supplemental SMF ¶ 1, Dkt. No. 42, Attach. 3.)[6]  Several months after she was hired, Smolyn was assigned the Western Massachusetts District as well, which included the Worcester and West Springfield, Massachusetts sales offices as well as the Vermont sales office.  (Defs.' SMF ¶¶ 6-7.)  Smolyn lived in Schenectady, New York during most of her employment.  (*Id.* ¶ 4.)  From her home, it took Smolyn an hour and a half to travel to the West Springfield office, two and a half hours to travel to the Worcester office, and three hours to travel to the Vermont office.  (*Id.* ¶¶ 8-10.)  She was to travel to the Worcester sales office once a week, and to the West Springfield office twice a week.  (*Id.* ¶ 11.)  Shortly after being assigned the Western Massachusetts District, the Worcester office was reassigned to another commercial sales manager, Michael Kinsman, who also was responsible for the Rhode Island District.  (*Id.* ¶¶ 12, 18.)  Thus, Smolyn and Kinsman split the Western Massachusetts District.  (*Id.* ¶ 13.)  Upon Kinsman's retirement,

_____

[6] In her response to defendants' motion for summary judgment, Smolyn provided a response to defendants' statement of material facts, (Dkt. No. 42, Attach. 4), which the court will refer to as "Pl.'s SMF," as well as a separate statement of additional material facts, (Dkt. No. 42, Attach. 3), which the court will refer to as "Pl.'s Supplemental SMF."  The court will refer to defendants' response to Pl.'s Supplemental SMF, (Dkt. No. 43, Attach. 1), as "Defs.' Supplemental SMF."

Thomas Maciag, who lives in Palmer, Massachusetts, took over as sales manager for Kinsman's territory. (*Id.* ¶¶ 19-20.)

Ken Poole became Smolyn's manager in late 2008 when he was named Area Sales Manager. (*Id.* ¶¶ 17, 22.) In this role, Poole held two annual district sales manager meetings, some of which he began by playing a beer commercial. (Dkt. No. 42, Attach. 8 at 50, 52.) In May 2011, while under the supervision of Poole, Smolyn gave birth to her first child, taking eight weeks of maternity leave from her job. (Defs.' SMF ¶¶ 22-23.) After Smolyn had returned to work, at a meeting in September 2011, Poole and Smolyn discussed the decreased performance of a male employee after the birth of his child and Poole commented that "[m]en don't really need paternity leave the same way that women do." (Dkt. No. 40, Attach. 6 at 58-59; Pl.'s Supplemental SMF ¶ 16; Defs.' Supplemental SMF ¶ 16.) According to Smolyn, Poole further stated that "it is more difficult for a mother to be apart from her children." (Dkt. No. 42, Attach. 6 at 60.)

In the spring of 2012, TIS hired Jackson Gibbon in the West Springfield office, whom Smolyn was responsible for mentoring. (Defs.' SMF ¶¶ 24-25; Dkt. No. 40, Attach. 6 at 66.) Thereafter, according to

4

defendants, concerns arose about Smolyn's job performance and how often she traveled to the West Springfield office.  (Defs.' SMF ¶¶ 34-35.) Smolyn admits that, at a September 10, 2012 meeting, Poole instructed her to travel to the West Springfield office more often to see newly hired employees,[7] and discussed the fact that, occasionally, she had "been a little late in providing" sales forecasts.  (Pl.'s SMF ¶¶ 35-36.)  Smolyn further contends that, at this meeting, Poole stated that Smolyn was "set-up to fail, because it's very difficult to maintain [her] family life, as well as travel, and [her] work duties, and everything else."  (Dkt. No. 40, Attach. 6 at 60; Dkt. No. 42, Attach. 6 at 60.)  She claims that Poole further elaborated that "because [she] had a child[, she] could not perform all of [her] responsibilities and was set up to fail."  (Dkt. No. 42, Attach. 6 at 60.)

The parties agree that, after Poole instructed her to travel to the West Springfield office more frequently, Smolyn immediately began doing so.  (Pl.'s Supplemental SMF ¶¶ 31, 33.)  Furthermore, throughout the time Poole supervised Smolyn, he rated her "exceeds expectations" and "meets expectations" in her annual performance evaluations.  (Defs.' SMF ¶ 67.)

---

[7] Gibbon was apparently one of multiple new hires in that office.  (Dkt. No. 40, Attach. 6 at 67.)

In addition to these positive performance reviews, Smolyn further contends that she received performance awards from defendants in 2009 and 2010 and was appointed by defendants to the "prestigious Ethics and Values Committee" for 2011 and 2012.  (Pl.'s Supplemental SMF ¶¶ 9-10.)  Moreover, she asserts that she was rated "[e]xceeds [e]xpectations" in 2012, and, for the period of October 2011 through August 2012, was ranked 38 out of 100 district sales managers in the country with a sales performance that was 104.63% of what TIS expected of her.  (*Id.* ¶¶ 20-22; Dkt. No. 42, Attach. 5 at 8, 11.)  During this same time frame, according to Smolyn, Maciag, with whom she split the management of the Western Massachusetts District, was ranked only 79 out of 100 district sales managers in the country with a sales performance that was only 86.1% of what the company expected of him, and was rated only "[m]eets [e]xpectations."  (Pl.'s Supplemental SMF ¶¶ 20-22; Dkt. No. 42, Attach. 5 at 9, 11.)[8]

In October 2012, Steve Marbes was hired as the Area General

---

[8] Defendants deny that these were the rankings, performance numbers, and 2012 performance evaluations of Smolyn and Maciag, and claim that the internal TYCO reports that Smolyn relies on to establish these facts are either incomplete, inaccurate, or fail to account for the fact that Smolyn and Maciag co-managed the Western Massachusetts District.  (Defs.' Supplemental SMF ¶¶ 20-22; Dkt. No. 42, Attach. 8 at 18-19.)

Manager for the New England Sales Area, and became responsible for focusing on the "profit and loss aspect of the New England Sales Area." (Defs.' SMF ¶¶ 37-38.)  In fulfillment of this responsibility, defendants contend that Marbes and Poole met on October 4, 2012 to assess the "spans of control" in the sales districts, i.e., the number of sales representatives directly reporting to each sales manager.  (*Id.* ¶¶ 40-41.) Defendants assert that Marbes decided to eliminate one sales manager position in the belief that there were too many managers for the number of people within the New England Sales Area.  (*Id.* ¶¶ 41-42.)  At a subsequent meeting in mid-October, defendants claim that the decision to eliminate Smolyn's position was made by Poole and Marbes based on the number of sales representatives that reported to her and the distance she had to travel to the sales offices.[9]  (*Id.* ¶¶ 45-46.)  They further claim that Smolyn's performance was not a factor in her firing, and, moreover, the sales managers in the New England Sales Area were all performing in a

_____

[9] The parties disagree as to the number of sales representatives whom Smolyn managed at the time of her termination as compared to the other sales managers.  (Defs.' SMF ¶¶ 31-33; Pl.'s Supplemental SMF ¶¶ 36-38.)  Defendants contend that Smolyn managed only four sales representatives, the least of all the sales managers in the New England Sales Area, including Maciag who managed seven people.  (Dkt. No. 40, Attach. 3 ¶ 8.)  Smolyn, on the other hand, asserts that, at the time of her firing, she managed five sales representatives, and had permission to hire one additional sales representative, while Maciag managed six sales representatives.  (Dkt. No. 42, Attach. 7 at 26.)

similar range.  (*Id.* ¶ 47.)

Although defendants claim that the decision to terminate Smolyn was made in mid-October, she was not terminated until November 1.  (*Id.* ¶ 60.) In the meantime, Smolyn informed the sales representatives whom she managed, including Gibbon, that she was pregnant on October 22 and 23, 2012.  (Pl.'s Supplemental SMF ¶ 50.)  Also on October 23, 2012, Smolyn gave permission to Gibbon to work with Poole the following day, October 24.  (*Id.* ¶ 51; Dkt. No. 42, Attach. 5 at 25.)  Subsequently, in the early morning of October 25, 2012, Poole contacted the Human Resources (HR) Department for approval to eliminate Smolyn's position and HR "began making the logistical arrangements for notifying Smolyn of this decision." (Defs.' SMF ¶¶ 51-53; Dkt. No. 40, Attachs. 12-13.)  At 10:40 A.M. that day, Smolyn informed Poole that she was pregnant.  (Defs.' SMF ¶ 54; Dkt. No. 40, Attach. 14.)  One week later, on November 1, 2012, Poole and an HR representative met with Smolyn and informed her that her position was being eliminated and offered her a position as a sales representative, which she declined.  (Defs.' SMF ¶¶ 60-62; Dkt. No. 40, Attach. 6 at 48.) At the time of her firing, Smolyn was the only female district sales manager out of six sales managers in her region.  (Pl's Supplemental SMF ¶ 11;

Def.'s Supplemental SMF ¶ 11; Dkt. No. 42, Attach. 8 at 42-43; Dkt. No. 48 at 2.) Since Smolyn was fired, Maciag has managed the Albany District and all of the Western Massachusetts District. (Dkt. No. 40, Attach. 3 ¶ 12.)

In January 2013, Smolyn filed a New York State Division of Human Rights complaint alleging gender discrimination, (Dkt. No. 1, Attach. 1), and both Poole and Marbes were interviewed separately. (Pl.'s Supplemental SMF ¶ 60; Dkt. No. 42, Attach. 5 at 35-45.) The notes of those interviews indicate that, when asked about when they first learned of Smolyn's 2012 pregnancy, both Poole and Marbes responded that there were "no rumors or rumblings" of the pregnancy prior to October 25, when Smolyn informed Poole directly.[10] (Dkt. No. 42, Attach. 5 at 37, 42.) The investigation by the Division of Human Rights found insufficient evidence to indicate that Smolyn was subjected to unlawful discrimination on the basis of sex. (Dkt. No. 40, Attach. 5.) Ultimately, Smolyn commenced this

---

[10] Defendants deny that both Poole and Marbes used the same language during the Division of Human Rights investigation to deny any knowledge of Smolyn's pregnancy. (Def.'s Supplemental SMF ¶ 60.) They contend that the document Smolyn relies on to establish the testimony of Poole and Marbes "is nothing more than the [i]nvestigator's notes from the proceeding" and "not a transcript of what was said verbatim." (*Id.*) However, in their respective depositions, both Marbes and Poole confirmed that the answers indicated by the investigator in the document which Smolyn relies on contained "the words that [they] spoke" in their interviews. (Dkt. No. 42, Attach. 7 at 32-34; Dkt. No. 42, Attach. 9 at 42-43.)

action with the filing of a complaint on January 17, 2014. (Compl.)

Following joinder of issue, (Dkt. No. 10), and the close of discovery, the

pending motions were filed, (Dkt. Nos. 40, 41).

### III. Standard of Review

The standard of review pursuant to Fed. R. Civ. P. 56 is well

established and will not be repeated here. For a full discussion of the

standard, the court refers the parties to its decision in *Wagner v. Swarts*,

827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v.

Sprague*, 489 F. App'x 500 (2d Cir. 2012).

### IV. Discussion

**A. Pregnancy Discrimination**

First, defendants argue that Smolyn cannot make out a prima facie

case of pregnancy discrimination because there is no evidence that

Marbes or Poole, the decision makers in her termination, knew of her

pregnancy before the decision to terminate her was made. (Dkt. No. 40,

Attach. 15 at 12-17.) Further, they contend that Smolyn was terminated for

legitimate, non-discriminatory reasons — namely, the span of control

Smolyn exerted and the distance she had to travel to the offices she

managed — and Smolyn cannot establish that the stated reasons for her

dismissal are pretext for discrimination. (*Id.* at 17-20.) In response, Smolyn argues that she has demonstrated that defendants discriminated against her based on her pregnancy. (Dkt. No. 41 at 13-17.) Alternatively, Smolyn argues that the circumstances surrounding her termination raise questions of fact as to whether Poole knew she was pregnant before the decision to terminate her was made, and that Poole and Marbes' use of the "exact[] same unusual phrase to answer the same question" posed to them at the Division of Human Rights hearing, along with other direct and circumstantial evidence, demonstrates that "defendants have skillfully fabricated explanations to conceal their wrongful acts of discrimination." (*Id.* at 14.) The court agrees with Smolyn that there are triable issues of fact with respect to her pregnancy discrimination claim which preclude summary judgement.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In 1978, the PDA was passed, "to enact Congress's determination that

discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *DeMarco v. CooperVision, Inc.*, 369 F. App'x 254, 255 (2d Cir. 2010) (internal quotation marks and citation omitted). The PDA accomplished this by "amend[ing] Title VII's definition of discrimination 'because of sex' to include discrimination 'because of or on the basis of pregnancy, childbirth, or related medical conditions.'" *Saks v. Franklin Covey Co.*, 316 F.3d 337, 343 (2d Cir. 2003) (quoting 42 U.S.C. § 2000e(k)). Thus, under the PDA, an employment practice is unlawful "when pregnancy is 'a motivating factor' for an adverse employment action." *Briggs v. Women in Need, Inc.*, 819 F. Supp. 2d 119, 126 (E.D.N.Y. 2011) (citing *Calabro v. Westchester BMW, Inc.*, 398 F. Supp. 2d 281, 287 (S.D.N.Y. 2005)).

Pregnancy discrimination claims, as with any other discrimination claim, are analyzed under the *McDonnell Douglas* burden-shifting rules, which place upon the plaintiff the initial burden of making out a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *DeMarco*, 369 F. App'x at 255; *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995). To satisfy this initial burden, the plaintiff must show that: "(1) she is a member of a protected class; (2) she

12

satisfactorily performed the duties required by the position; (3) she was discharged; and (4) her position remained open and was ultimately filled by a non-pregnant employee," or the discharge occurred under circumstances giving rise to an inference of unlawful discrimination. *Quaratino*, 71 F.3d at 64. In addition to the four elements of a prima facie case, a "[p]laintiff must also be able to point to some admissible evidence from which a rational jury could infer that [persons who participated in her termination decision] knew that the plaintiff was pregnant." *Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 277-78 (S.D.N.Y. 2008) (citing *Woodman*, 411 F.3d at 82-84); *see Ingenito v. Riri USA, Inc.*, No. 11-CV-2569, 2013 WL 752201, at *10 (E.D.N.Y. Feb. 27, 2013) (holding that, to make out a prima facie case of pregnancy discrimination, a "[p]laintiff must establish that the [d]efendants knew or had reason to believe she was pregnant before the decision to terminate her was made"). "A plaintiff's establishment of a *prima facie* case gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a legitimate, nondiscriminatory reason for the challenged employment action." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (internal quotation marks and citations omitted); *see Quaratino*, 71 F.3d at

13

64.  If the defendant comes forward with a legitimate, nondiscriminatory

reason for the challenged employment action, the presumption of

discrimination drops out of the analysis, and the defendant "will be entitled

to summary judgment . . . unless the plaintiff can point to evidence that

reasonably supports a finding of prohibited discrimination."  *James v. N.Y.*

*Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000); *see Legg v. Ulster Cty.*,

820 F.3d 67, 74 (2d Cir. 2016).

Ultimately, once the burden shifts back to the plaintiff, she must

show, without the benefit of the presumption, that the employer's

determination was in fact the result of discrimination.  *See Holcomb v. Iona*

*Coll.*, 521 F.3d 130, 138 (2d Cir. 2008).  The plaintiff must demonstrate "by

a preponderance of the evidence that the legitimate reasons offered by the

defendant were not its true reasons, but were a pretext for discrimination."

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *see*

*Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401 (2d Cir. 1998).  As further

explained by the Supreme Court, to demonstrate pretext, a plaintiff must

show "*both* that the [employer's proffered] reason was false, *and* that

discrimination was the real reason."  *St. Mary's Honor Ctr. v. Hicks*, 509

U.S. 502, 515 (1993); *see Quaratino*, 71 F.3d at 64.  However, conclusory

14

allegations of discrimination are insufficient to defeat a motion for summary judgment. *See Holcomb*, 521 F.3d at 137; *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

With respect to Smolyn's initial burden, defendants do not dispute that Smolyn satisfies the four prongs of a prima facie discrimination claim. (Dkt. No. 40, Attach. 15 at 12-17.) Instead, they argue that she cannot make out a prima facie case of pregnancy discrimination because she cannot establish that defendants knew of her pregnancy at the time the adverse employment decision was made. (*Id.* at 13-17.) According to defendants, the decision to terminate Smolyn was made in mid-October. (Defs.' SMF ¶ 45.) They point to the October 25, 2012 early hour emails sent by Poole to the HR Department regarding eliminating a sales manager position, as documentary evidence that the decision was made prior to Smolyn's pregnancy announcement to Poole later that same day. (*Id.* ¶¶ 51-53; Dkt. No. 40, Attach. 15 at 16.) Smolyn, on the other hand, points to the fact that: (1) she was fired one week after informing Poole that she was pregnant; (2) she began telling her subordinates that she was pregnant three days prior to the October 25 emails Poole sent to the HR Department; (3) Poole spent the day of October 24 with Gibbon, one of the

employees who was aware of Smolyn's pregnancy[11]; and (4) after more than a week of not acting on the alleged decision to terminate her position, Poole sent "desperate, emergency emails commencing at 6:46AM" to the HR Department to initiate her termination "on the date that [Smolyn] was meeting with . . . Poole to inform him personally of her pregnancy," and the day after Poole spent the day working with Gibbon. (Dkt. No. 41 at 4-5, 13, 15-16.)

The court agrees with Smolyn that she has adduced evidence from which a rational jury could infer that the decision makers in her firing knew that she was pregnant, prior to deciding to terminate her. Although defendants contend that the decision to fire Smolyn was made before she informed either her subordinates or Poole of her pregnancy, only the testimony of Poole supports defendants' claim that this decision was made

---

[11] While defendants admit that, on October 23, 2012, Gibbon requested permission from Smolyn to work with Poole on October 24, they deny that Poole and Gibbon spent October 24 working together. (Defs.' Supplemental SMF ¶¶ 51-52.) Defendants ground this denial on the deposition testimony of Gibbon. (*Id.*) Gibbon testified that, based on his email requesting permission to work with Poole on October 24, he most likely met with Poole on that date, although he could not "recall the exact event itself." (Dkt. No. 42, Attach. 5 at 32.) Evaluating this evidence in the light most favorable to Smolyn, *see Wagner,* 827 F. Supp. 2d at 92, a reasonable jury could conclude that Gibbon and Poole worked together on October 24, 2012. Notably, Gibbon does not recall whether or not he informed Poole of Smolyn's pregnancy. (Dkt. No. 42, Attach. 5 at 31.)

in mid-October.[12]  (Defs.' SMF ¶ 45; Dkt. No. 40, Attach. 9 at 14, 16.)  The only documentary evidence of the decision to eliminate Smolyn's position are the October 25, 2012 emails sent between Poole and the HR Department.  (Dkt. No. 40, Attachs. 12-14.)  These emails were sent after Smolyn informed her subordinates of her pregnancy.  (Pl.'s Supplemental SMF ¶ 50.)  Viewing the facts in the light most favorable to Smolyn, a reasonable jury could reject the testimony of Poole and find that the decision to terminate Smolyn did not occur until after she announced her pregnancy to her subordinates, and, further, that Poole learned of Smolyn's pregnancy from one of those subordinates prior to making the decision.[13]  *See Lambert*, 543 F. Supp. 2d at 279 (holding there was enough "circumstantial (and relatively weak), . . . evidence" to "raise[ ] a genuine issue of fact as to [the defendant's] knowledge of plaintiff's pregnancy" for the court to find that plaintiff made out a prima facie case).

Once a plaintiff makes out a prima facie case, a defendant must

---

[12] Defendants argue that it is undisputed that the decision to eliminate Smolyn's position was made in mid-October.  (Dkt. No. 43 at 13.)  On the contrary, Smolyn does not admit that this is when the decision was made, but, rather, admits that Poole testified at his deposition that this is when the decision was made.  (Defs.' SMF ¶ 45; Pl.'s SMF ¶ 45; Pl.'s Supplemental SMF ¶ 45.)

[13] For the same reason, that is, because there is a genuine dispute as to this material fact, Smolyn's cross motion for summary judgment on her pregnancy discrimination claim, (Dkt. No. 41 at 14-17), must fail.

submit a legitimate non-discriminatory reason for the plaintiff's termination. *See McDonnell Douglas*, 411 U.S. at 802.  Here, defendants met this burden by putting forth evidence that Smolyn was fired based on the span of control and the distance she had to travel to the sales offices.  (Dkt. No. 40, Attach. 9 at 33-34, 75; Dkt. No. 40, Attach. 10 at 12, 18.)  Smolyn contends that the span of control justification was pretext for discrimination, as Smolyn "w[as] soon to be in charge of the same number of employees" as Maciag, who replaced her.  (Dkt. No. 41 at 15.)  To support this contention she points to (1) the lack of any written evidence of defendants' span of control research; (2) the temporal proximity of her pregnancy announcement and her termination; (3) the fact that her performance, as evinced by performance reviews and sales numbers, was superior to that of Maciag; and (4) two comments made by Poole, which she characterizes as "comments about women being unable to perform the same as men." (*Id.* at 15-16.)

The court finds that a jury could reasonably conclude that defendants' justifications for the termination are pretextual, and that pregnancy discrimination was a motivating factor in the decision to terminate Smolyn.  Defendants presented the testimony of Poole and

Marbes indicating that Smolyn's span of control and her distance from the offices she managed was the reason for her termination.  (Dkt. No. 40, Attach. 9 at 5-6, 31; Dkt. No. 40, Attach. 10 at 12, 16, 18.)  Marbes defined "span of control" as the number of salespeople reporting to a sales manager.  (Dkt. No. 40, Attach. 10 at 16.)  Meanwhile, Smolyn has presented some evidence that she managed a similar number of employees as Maciag, and that her performance was better than that of Maciag.  To that end, Poole's own deposition testimony indicates that, at the time she was let go, Smolyn managed five sales representatives between the Albany, Vermont, and Springfield offices, and that she had gotten approval to hire one additional sales representative for the Albany office, while Maciag supervised six sales representatives.[14]  (Dkt. No. 42, Attach. 7 at 22, 24-25.)

Although defendants contend that the number of sales representatives whom each manager managed before Smolyn was terminated "is inconsequential" because "one of the goals of the

_____

[14] Defendants note that Poole also testified that he did not remember the numbers of sales representatives in each office in 2012, and contend that Smolyn actually managed only four employees while Maciag managed seven.  (Defs.' SMF ¶¶ 31-33; Defs.' Supplemental SMF ¶ 36; Dkt. No. 40, Attach. 3 ¶ 8.)  Notably, the only evidence defendants offer as to the number of sales representatives in each office is the certification of Poole in support of their motion for summary judgment.  (Defs.' SMF ¶¶ 32-33.)

realignment was to ensure that the sales managers had an equal span of control and lived in close proximity to their district," (Def.'s Supplemental SMF ¶ 36), the court agrees with Smolyn that this evidence, which indicates that Smolyn and the person who replaced her actually managed a similar number of employees at the time the decision to fire her was made, when viewed in the light most favorable to Smolyn, casts doubt on at least one of defendants' justification for plaintiff's termination, namely span of control. When coupled with the circumstances surrounding Smolyn's termination, including the timing of her firing, her consistently favorable performance evaluations, and the evidence that her performance was superior to that of the employee who replaced her, a reasonable jury could find that defendants' justification for her firing was a pretext for pregnancy discrimination. (Defs.' SMF ¶ 67; Pl.'s Supplemental SMF ¶¶ 20-22; Dkt. No. 42, Attach. 5 at 9, 11); *see Pellegrino v. Cty. of* Orange, 313 F. Supp. 2d 303, 316-17 (S.D.N.Y. 2004) (explaining that, in evaluating a plaintiff's evidence of pretext, a "'strong temporal correlation,' standing alone, is sufficient to sustain an inference of discrimination," but noting that "even a weak temporal correlation gains in persuasiveness if there is other evidence tending to support an inference of discrimination" (internal

citations omitted)); *see also Dollman v. Mast Indus., Inc.*, 731 F. Supp. 2d 328, 339-40 (S.D.N.Y. 2010) (finding that a reasonable jury could conclude that defendants' proffered restructuring justification was pretextual, given the circumstances surrounding the plaintiff's termination and her "consistently positive job evaluations" which left a question of fact about why she was selected for termination over the managers who remained). While a jury is free to reject the evidence that Smolyn puts forth and accept defendants' explanation, because Smolyn has raised a genuine issue of material fact as to whether defendants' reason for terminating her position is false and as to whether it is more likely that Smolyn's pregnancy was a motivating factor in her termination, the evidence before the court does not warrant summary judgment.

**B.   Gender Discrimination**

With respect to Smolyn's gender discrimination claim apart from her claim of pregnancy discrimination, defendants do not challenge the first three elements of Smolyn's prima facie case.  (*See generally* Dkt. No. 40, Attach. 15.)  They argue, however, that Smolyn cannot show that her termination occurred under circumstances giving rise to an inference of discrimination.  (*Id.* at 21-24.)  Even if Smolyn can make out a prima facie

case, defendants contend that she cannot point to any evidence that their reasons for her termination were pretext for gender discrimination.  (*Id.* at 24-25.)  Smolyn counters that her superior sales performance, combined with the fact that she was the only female sales manager whom Poole managed, as well as Poole's comments about women and use of a beer commercial during district sale manager meetings,[15] establishes a prima facie case of gender discrimination, and demonstrates that defendants' reasons for her termination were, in fact, pretext.  (Dkt. No. 41 at 7-13.)

Applying the *McDonnell Douglas* burden-shifting analysis to plaintiff's gender discrimination claim, the court concludes that Smolyn has made out a prima facie case of gender discrimination, apart from her pregnancy discrimination claim.  Defendants assert that Smolyn was fired as a result of a reduction in their sales manager work force.  However, in deciding which of their managers was to be fired, it would have been impermissible for defendants to consider the gender of their employees.  *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 55 (2d Cir. 1998) (explaining that the issue in discrimination cases can properly center on "whether the selection of the

---

[15] Smolyn suggests that playing a beer commercial to start manager meetings reveals that Poole harbored a bias against women.  (Dkt. No. 41 at 10.)

employees to be fired in a downsizing was influenced by an impermissible ground"); *see, e.g.*, *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 113 (2d Cir. 1992) ("[U]pon consolidation, [the defendant] was faced with a larger pool of employees than available positions.  In these circumstances, [the defendant] was entitled to allocate the accounting positions in accordance with its business judgment, but could not do so on account of employees' ages.")  The fact that the only female manager Poole managed in October 2012, out of six employees, was chosen for termination, along with the previously discussed evidence indicating that Smolyn's job performance was better than that of the employee who replaced her, and Poole's alleged comments about the differences between men and women with respect to their needs to care for their children, present circumstances which give rise to an inference sufficient to withstand a motion for summary judgment that gender was impermissibly considered in deciding which sales manager to fire.  *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (explaining that even stray remarks should be considered in the context of all of the evidence, to determine if the evidence is legally sufficient to sustain a reasonable inference that a decision maker was motivated by

discrimination), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).[16]

Furthermore, while defendants have proffered a legitimate, nondiscriminatory reason for Smolyn's termination, for the reason discussed above in connection with Smolyn's pregnancy discrimination claim under Title VII, *see supra* Part IV.A, Smolyn has raised a genuine issue of material fact as to whether defendants' reason for terminating her position is false and as to whether it is more likely that Smolyn's gender was a motivating factor in her termination.[17]  Specifically, Smolyn has presented some evidence to call into question one of defendants' proffered

_____

[16] Defendants argue that Poole's alleged comments cannot be used by Smolyn as evidence of discriminatory intent because they were not made in connection with the employment decision at issue.  (Dkt. No. 43 at 14-15.)  While it is true that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination," it is also true that "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."  *Tomassi*, 478 F.3d at 115.  Further, "[t]he relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class."  *Id.* at 16.  Here, Smolyn alleges that Poole made several comments, albeit in a context unrelated to the termination decision, about the greater need for women to care for their children, and the difficulty Smolyn inevitably had in balancing her care for her children and the travel requirements of her job.  (Dkt. No. 42, Attach. 6 at 60.)  Such comments could reasonably be construed by a jury as explaining why the decision to fire Smolyn over her colleagues was made.  *See Tomassi*, 478 F.3d at 116; *see also Danzer*, 151 F.3d at 56 (explaining that the label "stray" is inappropriate where "other indicia of discrimination" tie the remarks to an adverse employment action).

[17] Again, because there is a genuine dispute as to this material fact, Smolyn's cross motion for summary judgment on her gender discrimination claim, (Dkt. No. 41 at 7-13), must fail.

reasons for her firing, that is, the span of control she exerted at the time of her firing.  (Dkt. No. 42, Attach. 7 at 22, 24-25.)  This evidence, when combined with her prima facie case, would permit a reasonable jury to conclude that defendants unlawfully discriminated.  *See Sands v. Rice*, 619 F. App'x 31, 32 (2d Cir. 2015).  Thus, defendants' motion for summary judgment on Smolyn's gender discrimination claim, apart from her pregnancy discrimination claim, is also denied.

## C.    Claims Against TIMCO

Finally, defendants argue that the court should dismiss this action in its entirety as it pertains to defendant TIMCO.  (Dkt. No. 40, Attach. 15 at 25.)  According to defendants, TIMCO did not employ Smolyn, nor did it play any role in the decision to eliminate her position.  (*Id.*)  Smolyn responds that as parent company of TIS and ADT Security Services, TIMCO is involved in the management and control of these two subsidiary companies and their employees.  (Dkt. No. 41 at 17.)  Smolyn further contends that TIMCO sets the standards for the management and behavior of all subsidiary company employees.  (*Id.*)  Notably, both parties memoranda of law are devoid of any citation to, or discussion of, legal authority to support their claims on this issue.  (Dkt. No. 40, Attach. 15 at

25; Dkt. No. 41 at 17.)

An employer-employee relationship is a required element of an employment discrimination claim under Title VII. *See Heller v. Consol. Rail Corp.*, 331 F. App'x 766, 768 (2d Cir. 2009); *Gulino v. N.Y.S. Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006). In that context, the court "may look past the formal separation among corporate affiliates when 'extraordinary circumstances' permit treating a parent and a subsidiary as a 'single employer.'" *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 155 (2d Cir. 2014) (quoting *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996)). To that end, the Second Circuit has adopted a four-part test to determine when, for the purposes of a Title VII claim, a parent company may be considered the employer of a subsidiary's employee. *See id.* at 155-56; *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014). "Under this test, '[a] parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.'" *Brown*, 756 F.3d at 226-27 (quoting *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)). "Although no one factor controls the analysis, the second, 'centralized

control of labor relations,' is the most significant." *Turley*, 774 F.3d at 156 (citing *Cook*, 69 F.3d at 1240-41). "In essence, a court must consider whether 'an employee, formally employed by one entity, . . . has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity.'" *Brown*, 756 F.3d at 226 (quoting *Arculeo v. On-Site Sales & Mktg., L.L.C.*, 425 F.3d 193, 198 (2d Cir. 2005)).

Here, Smolyn alleges that TIMCO "is responsible for the discriminatory acts of the other defendants," (Dkt. No. 41 at 17), based on the following facts: (1) TIMCO was "involve[d] in" Smolyn's employee benefits and rules of ethical conduct; (2) Smolyn "had studied Tyco International's Conflict of Interest Policy Statement and completed Tyco International's Conflict of Interest questionnaire" in April 2012; and (3) the Separation From Employment Agreement and General Release provided to Smolyn states that TIS' parent company was a party to the agreement and references Tyco International's Severance Plan for U.S. Employees, (Dkt. No. 48 at 1; Dkt. No. 42, Attach. 9 at 46-76).

The court finds that, viewing the evidence in the light most favorable to Smolyn, these facts do not provide a sufficient basis for a reasonable

jury to conclude that the two companies, TIS and TIMCO, constituted a single employer for the purposes of her Title VII claims. Smolyn has pointed to little or no evidence of interrelationship of operations[18] or common management between the two companies. *Cf. Herman v. Blockbuster Entm't Grp.*, 18 F. Supp. 2d 304, 312-13 (S.D.N.Y. 1998) (finding the plaintiffs' evidence of common management insufficient where the "two entities maintained distinct management structures" and there was no evidence that the parent's corporate officers had "participated in any respect in the employment decisions affecting [the p]laintiffs"), *aff'd*, 182 F.3d 899 (2d Cir. 1999); *Regan v. In the Heat of the Nite, Inc.*, No. 93 CIV. 862, 1995 WL 413249, at *3 (S.D.N.Y. July 12, 1995) (finding interrelationship of operations where employees rotated informally between

---

[18] "When considering the 'interrelation of operations' prong" of the analysis, district courts in this Circuit

> have considered factors including: '(1) whether the parent was involved directly in the subsidiary's daily decisions relating to production, distribution, marketing, and advertising; (2) whether the two entities shared employees, services, records, and equipment; (3) whether the entities commingled bank accounts, accounts receivable, inventories, and credit lines; (4) whether the parent maintained the subsidiary's books; (5) whether the parent issued the subsidiary's paychecks; and (6) whether the parent prepared and filed the subsidiary's tax returns.'

*Velez v. Novartis Pharm. Corp.*, 244 F.R.D. 243, 254 (S.D.N.Y. 2007) (quoting *Herman v. Blockbuster Entm't Grp.*, 18 F. Supp. 2d 304, 309 (S.D.N.Y. 1998), *aff'd* 182 F.3d 899 (2d Cir. 1999)).

the relevant companies, and where employee records, payroll records, and bank deposits of each company were kept together); *Linskey v. Heidelberg E., Inc.,* 470 F. Supp. 1181, 1184 (E.D.N.Y. 1979) (finding that there was an issue of fact as to whether the parent company could be considered the plaintiff's employer where the subsidiary could request employees from the parent, and the parent had the "absolute privilege" of appointing employees to the subsidiary, including its president).  Moreover, none of the evidence which Smolyn presents is "akin to 'handling job applications, approving personnel status reports, [or] exercising veto power over major employment decisions,' activities which [the Second Circuit has] held to constitute evidence of centralized control of labor relations."  *Shiflett v. Scores Holding Co., Inc.*, 601 F. App'x 28, 31 (2d Cir. 2015) (quoting *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000)). Accordingly, defendants' motion for summary judgment with respect to defendant TIMCO is granted.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 40) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to the claims against defendant Tyco

International Management Company, LLC, and the claims

against that defendant are **DISMISSED**; and

**DENIED** in all other respects; and it is further

**ORDERED** that the Clerk terminate Tyco International Management

Company, LLC as a party to this action; and it is further

**ORDERED** that Smolyn's cross motion for summary judgment (Dkt.

No. 41) is **DENIED**; and it is further

**ORDERED** that this case is trial ready and the Clerk shall issue a

trial scheduling order in due course; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

July 28, 2016
Albany, New York

Gary L. Sharpe
U.S. District Judge